IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


GUILLERMO VALDEZ,

        Petitioner,

vs.                                            CIVIL NO. 96-1046 SC/LFG

JOE WILLIAMS, Warden,

        Respondent.


## MAGISTRATE JUDGE'S PROPOSED FINDINGS
## AND RECOMMENDED DISPOSITION[1]

THIS MATTER came before the Court on an Evidentiary Hearing conducted November 29, 1999.

1   This is a proceeding for writ of habeas corpus pursuant to 28 U.S.C. § 2254, filed July 29, 1996, and supplemented December 15, 1997.  Respondent filed his Answer, counsel was appointed, and an evidentiary hearing was held.  Petitioner Guillermo Valdez ("Valdez") challenges the judgment and sentence entered on June 20, 1995 (as amended November 21, 1995) by the Thirteenth Judicial District Court in State v. Valdez, No. CB-94-162-CR (County of Cibola, New Mexico).

2.  As grounds for relief, Valdez asserts that he was denied effective assistance of counsel in that his attorney failed to object to inadmissible evidence and failed to adequately cross-examine the

---

[1] Within ten (10) days after a party is served with a copy of these proposed findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such proposed findings and recommendations with the Clerk of the Court.  A party must file any objections within the ten-day period allowed if that party wants to have appellate review of the proposed findings and recommendations. If no objections are filed, no appellate review will be allowed.

state's witnesses, failed to make proper objection to the composition of the jury panel, and failed to call witnesses who could have corroborated his testimony that he was innocent.

## Facts and Procedural History

3.  Valdez was charged with various felony offenses occurring in Cibola County, State of New Mexico, including practicing medicine without a license and unlawfully procuring controlled substances. The incidents in question were alleged to have occurred on May 18, 1994.

4.  Following his arrest, Valdez, an individual of African descent, contacted the National Association for the Advancement of Colored People ("NAACP") to seek its recommendation for legal assistance. The NAACP recommended attorney Richard B. McClarkin ("McClarkin"), a well-known criminal defense lawyer who is African-American.

5.  Attorney McClarkin is an experienced criminal litigator. He is licensed in both state and federal courts of New Mexico, and is currently on the federal court's CJA panel.

6.  Valdez met with McClarkin and McClarkin agreed to represent him. In the interim, Valdez sought court-appointed counsel, and the office of the State Public Defender independently contacted McClarkin to see if he would represent Valdez as an indigent defendant. McClarkin agreed. Thus, McClarkin, who had been Valdez' choice of counsel, was appointed to represent him.

7.  At the time of the representation, McClarkin was in private practice and primarily engaged in criminal defense work. He has been an attorney in New Mexico since 1987. Following his admission to the bar, he worked with DNA-People's Legal Services, the legal services program on the Navajo reservation. Subsequently, he served as a criminal defense attorney with the State's Public Defender office, and thereafter as a prosecutor in McKinley, Sandoval and Cibola counties. At the time of his representation of Valdez, McClarkin had tried approximately thirty felony cases.

8. Subsequent to issuance of the indictment, McClarkin sat down with Valdez and reviewed the charges, penalties and procedures that would be followed. He discussed potential defenses and sought Valdez' assistance in preparing the defense of the case.

9. The principal charge was that Valdez practiced medicine without a license by using prescriptions he wrote to procure controlled substances in New Mexico.

10. Valdez did not deny giving the prescriptions to a pharmacist, but contended that he had written the prescriptions in Puerto Rico, not New Mexico, and that when he gave them to the pharmacist, he was merely seeking information on the validity of the prescriptions.

11. Valdez was not licensed to practice medicine in the State of New Mexico. Valdez' theory of defense, however, was that he was licensed to practice medicine in the Commonwealth of Puerto Rico at the time he filled out the prescriptions.

12. McClarkin intended to defend the case by proving that Valdez was a physician in Puerto Rico. He asked Valdez to produce his medical license or, alternatively, to provide him with information where he could obtain verification of licensing. While Valdez professed that he was licensed, he failed to produce any information, verification or proof of licensure.

13. Upon McClarkin's repeated requests for verification of Valdez' claims, Valdez provided McClarkin with names of two individuals who, he said, could confirm that Valdez worked as a physician. Aside from their names, the only information supplied by Valdez was the phone numbers of these two persons. McClarkin made numerous attempts to reach these individuals, but no one ever answered. McClarkin conveyed this information to Valdez and told him that he could not verify Valdez' claims. He sought Valdez' assistance in attempting to verify the claims. McClarkin

contacted the New Mexico Board of Medical Examiners and learned that Valdez was not licensed in New Mexico nor was he licensed to practice medicine anywhere in the United States.

14. In his meetings with Valdez, McClarkin discussed the importance of securing evidence that Valdez was licensed to practice medicine. In the absence of such evidence, McClarkin advised that it was likely they would lose the case. While Valdez was adamant that he was a licensed physician, he could not produce any materials or evidence in support of his claim.

15. During the course of discovery, McClarkin received documents from the prosecutor showing a transcript from the University of Havana in the name of Guillermo Valdez, which indicated that Valdez had attended the Havana Medical School in pursuit of a degree in medicine. However, the prosecutor had no written verification of any medical license.

16. McClarkin, on his own initiative, utilized the services of an investigator in Puerto Rico to explore the licensing issue. His investigator was a police officer who gave him the name of the Puerto Rico medical licensing authority, and McClarkin personally spoke with an individual at that agency. McClarkin learned that, based on Valdez' claims of licensure in Havana, Valdez had been granted a provisional license to practice medicine in Puerto Rico pending receipt of certain documents and verifications. However, the required verifications and documents were not submitted, and the provisional license was not renewed. McClarkin was told that Valdez was not licensed to practice medicine in Puerto Rico and, at the time he wrote the prescription, was not a licensed medical doctor in the Commonwealth of Puerto Rico. This information directly refuted Valdez' claims.

17. Verification that Valdez was not a licensed physician would not help the proposed defense, and McClarkin did not request copies of the documents from the Puerto Rico licensing authorities. However, McClarkin advised Valdez that Puerto Rican licensing officials refuted the

contention that Valdez was a licensed doctor. Valdez remained adamant in his position that he was licensed, but still he could not produce verification.

18. Throughout this time, Valdez was free on bond and was available to secure documents or verification concerning his claimed licensure.

19. McClarkin spoke with Valdez about a possible negotiated plea. Valdez refused to discuss a plea of guilty and was adamant about proceeding to trial. Nevertheless, he was unable to produce any evidence of licensure.

20. Prior to trial, McClarkin advised Valdez that without evidence of licensure, they had no defense. He would be unable to prove that Valdez was licensed in the absence of a certificate of license, and it was likely that Valdez would be found guilty.

21. As an African-American attorney, McClarkin was sensitive to issues related to jury panel composition challenges. He has previously challenged the absence or under-representation of minorities on venire panels in cases where the evidence so warranted, and he has pursued "Batson" issues. See Batson v. Kentucky, 476 U.S. 79, 90-96, 106 S. Ct. 1712, 1719-22 (1986).

22. McClarkin practiced law in Cibola County and was familiar with the percentage of African-Americans residing there. He did not believe that he had a viable claim for minority under representation on the jury panel, under Batson or any other authority, and though aware of the procedure for raising Batson issues, did not feel that such a motion was appropriate or would be successful.

23. In pretrial proceedings, McClarkin advised Valdez of the process for striking jurors. He advised Valdez to tell him if there were a particular juror he did not wish to serve on the jury panel, and McClarkin would exercise a peremptory challenge. Valdez did not object to any particular juror

serving on the panel, but he did object to the fact that there were no African-Americans on the venire.

24. McClarkin admits that he did not object to the hearsay testimony of various witnesses, including the hearsay testimony of Ernest McNeely and investigating Officer Eric Lucero. McClarkin states that as trial strategy, he avoids objecting to testimony if possible. He testified that jurors want to hear a story, and if they feel that evidence is being kept from them, they may hold it against the defendant. Further, he testified that the hearsay statements offered were not key to the defense, and he was concerned that the jury might feel that defendant was unfairly trying to keep evidence out.

25. Valdez testified at his trial that he was licensed in Puerto Rico, that he had filled out the prescriptions in his wife's name even though the drugs were for him, and that he didn't present the prescriptions to obtain drugs, but only to find out if they were valid. These claims were obviously rejected by the jury, and Valdez was convicted.

26. At the evidentiary hearing conducted on the petition for writ of habeas corpus, Valdez testified first that he filled out the prescription in his aunt's name, but thereafter testified that he filled it out in his wife's name. In his pre-hearing pleadings, he stated that the controlled substances which were obtained by the prescription were for him, but because it was improper in Puerto Rico to fill out a prescription in his own name, he simply used his wife's name. However, at the evidentiary hearing, he retracted that claim and stated that both he and his wife took the same medication, and therefore it did not matter in whose name the prescription was written. He did concede, however, that his practice in this regard was unethical.

27. Valdez claims to have been provisionally licensed to practice medicine in the states of Georgia, Indiana and Washington, D.C. He further claims that he had a full license to practice

medicine in the Commonwealth of Puerto Rico. When pressed for proof of these licenses, Valdez simply stated that he threw away evidence of provisional licensure, and that he provided McClarkin with a certificate of licensure.

28. Valdez testified that he had a certificate to show that, at the time in question, he was licensed to practice medicine in Puerto Rico. He testified that he had a copy of his medical license in his briefcase at his hotel, but had failed to bring it to court. The Court directed him to produce the certificate within twenty-four hours.

29. Valdez did not produce the promised certificate, nor did he produce any written verification or documentation demonstrating a license to practice medicine in Washington, D.C., Georgia, Indiana or elsewhere.

30. Following the hearing, the Court issued an Order [Doc. 34], giving Respondent the opportunity to conduct an investigation into the authenticity of any documents submitted by Valdez concerning his licensure. On January 7, 2000, Respondent submitted the Affidavit of Investigator Jose M. Arguello [Doc.41], with certified exhibits from the Commonwealth of Puerto Rico Health Department, Puerto Rico Board of Medical Examiners, showing that Valdez has never had a permanent license to practice medicine in Puerto Rico, but was provisionally licensed to practice medicine within public service, for one year from May 1, 1987 through April 30, 1988.

31. The certified documents conclusively demonstrate that Valdez was not licensed to practice medicine on May 14, 1994, the date on which the criminal acts allegedly occurred.

32. On December 8, 1999, the Court authorized Valdez' counsel to withdraw [Doc. 38]. The Court further issued an order directing Valdez to demonstrate why new counsel should be appointed. The Court's order noted that counsel had been appointed while Valdez was incarcerated and indigent.

Counsel represented Valdez prior to and throughout the evidentiary proceeding. Since the date of appointment of counsel, however, Valdez had been released from custody and was employed or expecting employment. Thus, there was a question concerning Valdez' indigency.

33. Valdez failed to respond to the Court's order; he failed to demonstrate why substitute counsel should be appointed; and failed to submit any evidence demonstrating indigency. Accordingly, on January 5, 2000, the Court denied the appointment of counsel [Doc. 40].

34. Valdez claims his attorney was constitutionally ineffective. To establish ineffective assistance of counsel, Valdez must make a showing that: (1) counsel's performance was constitutionally defective; and (2) the deficient performance prejudiced his defense in that counsel's errors were so serious as to deprive him of a fair trial with a reliable result. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); Rogers v. United States, 91 F. 3d 1388, 1391-92 (10th Cir. 1996). The "prejudice" prong requires that Valdez show, to a reasonable probability, that but for counsel's unprofessional errors the result of the proceeding would have been different. Strickland, 466 U.S. at 694.

35. Valdez must overcome a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance that might be considered sound trial strategy. Duvall v. Reynolds, 139 F.3d 768, 777 (10th Cir.), *cert. denied*, 119 S. Ct. 345 (1998). Scrutiny of counsel's performance must be "highly deferential" and must avoid the distorting effects of hindsight. Miles v. Dorsey, 61 F.3d 1459, 1474 (10th Cir. 1995). To establish a deficient representation by counsel rising to the level of a constitutional violation, Valdez must show that his attorney's performance was completely unreasonable, not merely wrong, so that it bears no relationship to a possible defense

strategy. <u>Hoxsie v. Kerby</u>, 108 F.3d 1239, 1246 (10th Cir. 1997). Valdez has not made such a showing in this case.

36. Valdez claims that his attorney was ineffective in failing to object to inadmissible hearsay evidence, including statements by Ernest McNeely and Eric Lucero to the effect that someone had been posing as a physician in Grants, and that Lucero was told Valdez did not have a valid DEA certificate and did not have a valid license to prescribe drugs. In addition, Valdez argues that his trial attorney failed to object to speculative testimony by two witnesses, to evidence of a prior arrest, to testimony regarding Valdez' post-arrest silence, and to hearsay evidence that Valdez had some trouble with the DEA and with New Mexico medical licensing authorities. There is a reasonable probability, Valdez argues, that he would not have been convicted, but for these failures. Petitioner's Memorandum Brief [Doc. 19], at 17-24.

37. The Sixth Amendment does not guarantee an errorless trial, and "prevailing professional norms" do not require perfection at trial. <u>Denton v. Ricketts</u>, 791 F.2d 824, 828 (10th Cir.1986); *see also*, <u>United States v. Haddock</u>, 12 F.3d 950, 956 (10th Cir.1993). Failure to object to evidence does not, in and of itself, render an attorney ineffective. <u>Yarrington v. Davies</u>, 992 F.2d 1077, 1080 (10th Cir. 1993). Even if objections to hearsay evidence would have been proper, petitioner must show there is a reasonable probability that, but for counsel's failure to object, the result of the proceeding would have been different. In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the jury. <u>Id.</u>; <u>Strickland</u>, 466 U.S. at 695.

38. McClarkin testified at the evidentiary hearing that his style is to make very few objections at trial, because "juries want to hear," and he does not think it is good strategy to be confrontational

about someone the jury is listening to.  He also stated he feels that constant objections make a jury angry because they interrupt the witness, and the jury may see such interruptions as an attempt to twist what the witness is saying.  He felt that what was crucial in this case was the lack of a licensing document, and that the case did not turn on hearsay evidence.  In light of this explanation, the Court cannot say that McClarkin's failure to object was "completely unreasonable" and bore no relationship to a defense strategy.

39.  Furthermore, given the lack of evidence of licensure, Valdez has failed to show that the outcome would have been different if McClarkin had made more frequent objections.  The failure to object did not render the proceeding "fundamentally unfair or unreliable."  Lockhart v. Fretwell, 506 U.S. 364, 369, 113 S. Ct. 838, 842 (1993); *see also,*  Haddock, at 955-56; Nguyen v. Reynolds, 131 F.3d 1340, 1350 (10th Cir. 1997), *cert. denied*, 119 S. Ct. 128 (1998).

40.  Valdez also claims that his attorney was ineffective in failing to present evidence and call witnesses who could have corroborated his innocence.  Valdez contends that his wife should have been called as a witness, because she could have testified that the medications were not for her, but were meant for Valdez alone.  In addition, Valdez contends that his attorney should have subpoenaed the pharmacy computer records, which would have confirmed the wife's testimony. If this evidence had been presented, Valdez argues, there is a reasonable probability that he would have been exonerated of the charges of unlawfully distributing a controlled substance to another.  However, Valdez himself testified at the evidentiary hearing that he and his wife were taking the same medication, and that the prescription was meant both for her and for himself.

41.  McClarkin testified at the evidentiary hearing that he spoke with Valdez's wife, Aurora Valdez, several times prior to trial, but does not remember whether he ever considered having her

testify. He felt at the time that the primary issue in the case was whether Valdez was a licensed doctor, and his wife's testimony as to the circumstances surrounding the filling of the prescription would not have been relevant to that issue. As to the pharmacy records, McClarkin said that Valdez conceded at trial that a transaction took place at the pharmacy, and he didn't consider that the records would have added anything to the defense.

42. Generally, the decision whether to call a particular witness rests within the sound discretion of trial counsel. Jackson v. Shanks, 143 F.3d 1313, 1319 (10th Cir.), *cert. denied*, 119 S. Ct. 378 (1998). Such decisions involving trial tactics and strategy are "virtually unchallengeable." Strickland, at 690. McClarkin testified that neither Aurora Valdez' testimony, nor the pharmacy records, would have helped to clarify the issue of Valdez' qualifications to practice medicine, and counsel is given broad latitude to make strategic and tactical choices regarding appropriate action to take or refrain from taking while acting in a representative capacity. Id., at 688-89. Particularly in light of Valdez' admission at the evidentiary hearing that the medications were obtained in part for his wife, the Court cannot say that McClarkin's failure to call the wife, to testify that the prescription was for Valdez alone, was a serious error effectively denying Valdez the "counsel" guaranteed by the Sixth Amendment. *See*, Strickland, at 668, 687.

43. Finally, Valdez claims that his counsel was ineffective in failing to object that the jury panel did not contain any African-American members and was not drawn from a fair cross section of the community.

44. McClarkin testified at the evidentiary hearing that he had been practicing criminal law in Grants for about four years at the time of the Valdez trial and was familiar with the ethnic makeup of the community. He stated that the subject of ethnic composition in the venire panel did not arise

until the time of trial, and he was aware at that time that Valdez was concerned about it. McClarkin said that he explained to Valdez that there were very few African-Americans in the Grants area, and that there was no legal reason to bring an objection based on the scarcity of blacks on the jury panel. He also stated that Valdez was present at the time of jury selection and made no specific objection to any particular juror.

45. The Sixth Amendment guarantees "the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." The right to an impartial jury encompasses the right to a jury drawn from a "fair cross section of the community." Taylor v. Louisiana, 419 U.S. 522, 526-31, 95 S. Ct. 692, 696-98 (1975). A defendant challenging the composition of the jury pool on Sixth Amendment grounds must show, *inter alia*, that the representation of a particular group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community, and that this under representation is due to a systematic exclusion of the group in the jury selection process. Duren v. Missouri, 439 U.S. 357, 364, 99 S. Ct. 664, 668 (1979).

46. McClarkin testified that he had no legal grounds for raising an objection to the venire panel, and Valdez has not presented this Court with any evidence that the venire panel in his case did not represent a fair cross section of the Grants community. Although racial groups cannot constitutionally be excluded from the venire from which a jury is selected, Strauder v. West Virginia, 100 U.S. 303 (1879), Valdez has presented nothing beyond a mere allegation that any particular racial group was excluded from the venire panel in Cibola County. A claim relating to jury composition is meritless when it "amount[s] to nothing more than a set of conclusory allegations." Hilliard v. Kaiser,

131 F.3d 151 (Table, text in Westlaw), No. 97-6163, 1997 WL 758861, at *1 (10th Cir. Dec. 9, 1997).

47.   To the extent Valdez' venire argument is based on equal protection grounds (see Petitioner's Memorandum Brief [Doc. 19], Attachment A, at 7-9), he has failed to establish a prima facie case, in that he has not shown that the government purposefully discriminated against his racial group. Batson v. Kentucky.

48.   Valdez' argument is, essentially, that he has a constitutional right to be tried by a jury of a particular ethnic composition.  Although juries "must be drawn from a source fairly representative of the community," Taylor, 419 U.S. at 538, "a defendant has no right to a petit jury composed in whole or in part of persons of his own race.  The Constitution does not demand a representative jury, but only an impartial one" [internal punctuation marks omitted]. Beachum v. Tansy, 903 F.2d 1321, 1331 (10th Cir. 1990) (*citing* Batson; and Holland v. Illinois, 493 U.S. 474, 110 S. Ct. 803 (1990)); United States v. Brooks, 161 F.3d 1240, 1246 (10th Cir. 1998).  The constitution is violated only by "restricting jury service to only special groups or excluding identifiable segments playing major roles in the community." Taylor, 419 U.S. at 530.  McClarkin testified that African-Americans do not play a major role in the Grants community.  His decision not to protest the absence of African-Americans on the venire panel, given his knowledge of the community and his experience in criminal litigation, does not constitute constitutionally deficient performance.

49.   Based on the evidence as a whole, Valdez failed to demonstrate that his counsel's performance was constitutionally defective and that the alleged deficient performance deprived Valdez of a fair trial with reliable results.

50.   Valdez has not rebutted the presumption that his counsel's conduct fell below the wide range of professional assistance that might be considered appropriate trial strategy.

51.   Valdez has not demonstrated that the results of the proceeding would likely have been different, but for his attorney's claimed errors and omissions.  In sum, Valdez failed to carry the requisite burden necessary to obtain the relief requested.

### Recommended Disposition

That the petition be denied and the action be dismissed with prejudice.

_Lorenzo F. Garcia_
Lorenzo F. Garcia
United States Magistrate Judge

PETITIONER:
Guillermo Valdez, pro se
P. O. Box 41027
San Juan, Puerto Rico  00949

ATTORNEYS FOR RESPONDENT:
Max Shepherd, Esq.
Joan M. Waters, Esq.